**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| ALEXANDER FREUND, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 15-cv-7965 |
| v. | ) | |
| | ) | Judge Robert M. Dow, Jr. |
| UBS FINANCIAL SERVICES, INC., | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Alexander Freund filed this action against Defendant UBS Financial Services, Inc. ("UBS") pursuant to 28 U.S.C. § 1332 to enjoin an arbitration proceeding before the Financial Industry Regulatory Authority ("FINRA") Office of Dispute Resolution. Plaintiff seeks a declaration that FINRA does not have jurisdiction over him and cannot require him to participate in the FINRA arbitration because there is no valid arbitration agreement between Plaintiff and UBS. Before the Court is Plaintiff's motion for a preliminary injunction and expedited ruling [5]. For the reasons set forth below, the Court denies Plaintiff's motion for a preliminary injunction, but grants the motion for expedited ruling [5].

**I.     Background**

UBS is a member of FINRA. UBS hired Plaintiff as a Client Service Associate on November 7, 2011. Plaintiff's manager was financial advisor David Kinnear. According to UBS, Kinnear and Plaintiff were old family friends and Kinnear requested that UBS hire Plaintiff. At the time of his hiring, Plaintiff signed a letter agreement [1-1] with UBS. Plaintiff agreed that he would "not disclose to any person any Confidential Information relating to UBS Financial Services Inc., UBS AG, or any of their subsidiaries or affiliates ('UBS Group') except

in the course of carrying out [his] duties * * * or as required by an order of court or governmental agency with jurisdiction." *Id.* at 2. Plaintiff also committed to "adhere to all federal laws and rules and regulations of the various exchanges or other regulatory and/or self-regulatory organizations of which [UBS] is a member as well as all internal rules, regulations[,] policies and codes of conduct that the Firm has established." *Id.* at 3. The letter agreement does not mention FINRA or arbitration.

On February 15, 2012, Plaintiff tendered his resignation from UBS. Later the same day, Wells Fargo hired Plaintiff as a Client Associate. Kinnear and two other UBS employees, Kathleen Bakas, a broker, and Steven Fryman, an associate, also resigned from UBS and accepted employment from Wells Fargo on February 15, 2012. On February 16, 2012, UBS filed suit against Kinnear and Bakas in the Circuit Court for Cook County, Illinois (Case. No. 12-CH-5333) seeking an injunction to prevent Kinnear and Bakas from violating restrictive covenants contained in their employment agreements with UBS. Plaintiff and Fryman were not parties to the Cook County lawsuit.[1] On February 16, 2012, UBS filed a Statement of Claim with FINRA's Office of Dispute Resolution (Case No. 12-554) against Kinnear, Bakas, and Wells Fargo; Plaintiff was not named as a respondent.

On April 19, 2012, while employed at Wells Fargo, Plaintiff submitted an application for registration with FINRA. This was the first time that Plaintiff sought to register with FINRA. Wells Fargo is a FINRA member. Plaintiff's application included a signed Form U-4. The U-4 is the Uniform Application for Securities Industry Registration or Transfer. Representatives of broker-dealers, investment advisers, or issuers of securities must use this form to become registered in the appropriate jurisdictions and/or self-regulatory organizations ("SROs"). The U-4 contains an arbitration clause. Specifically, the U-4 provides:

---

[1] According to Plaintiff, the Cook County lawsuit was settled by agreement of the parties.

> I agree to arbitrate any dispute, claim or controversy that may arise between me and my firm, or a customer, or any other person, that is required to be arbitrated under the rules, constitutions, or by-laws of the SROs indicated in Section 4 (SRO REGISTRATION) as may be amended from time to time and that any arbitration award rendered against me may be entered as a judgment in any court of competent jurisdiction.

[11-1] at 9. On February 21, 2013, FINRA accepted Plaintiff's application for registration.

On October 23, 2013, UBS filed an Amended Statement of Claim with FINRA. The Amended Statement of Claim added Plaintiff as a respondent. UBS alleges that Kinnear, assisted by Plaintiff, Bakas, and Fryman, "stole thousands of confidential UBS client and business records and other proprietary information from UBS in the months preceding [their] resignation" and that Wells Fargo "aided and abetted Kinnear's efforts to misappropriate UBS records and wrongly solicit UBS clients." [1-1] at 6-7. UBS further alleges that Plaintiff, during his "short tenure at UBS," "created over a dozen excel spreadsheets on his personal computer that contained a mountain of confidential UBS client information," and "then emailed those spreadsheets from his personal email account to Kinnear's personal email accounts on multiple occasions." [1-1] at 25. According to UBS, Plaintiff "admitted at his deposition in the State Court Litigation that he had kept those spreadsheets on his personal computer when he resigned from UBS and joined Wells Fargo." *Id.* at 26. "[O]ver the ensuing weeks and months" following the team's resignation, UBS alleges, "Kinnear used the stolen records and information that he had misappropriated from UBS" to solicit business from UBS clients. *Id.* at 42.

UBS's Amended Statement of Claim contains two claims against Plaintiff: Count III for breach of contract; and Count IV for breach of fiduciary duty and duty of loyalty. In Count III (which is also brought against Kinnear, Fryman, and Bakas), UBS alleges that Plaintiff breached his contractual duty to maintain the confidentiality of UBS's confidential client information during and after his employment at UBS. In Count IV (which is also brought against Wells

Fargo, Kinnear, Fryman, and Bakas), UBS alleges that Plaintiff owed a fiduciary duty of complete loyalty and fidelity to UBS during his employment at UBS, which he breached while still employed at UBS by removing UBS's confidential information and providing it to Wells Fargo, by simultaneously acting on UBS's and Wells Fargo's behalf, and by making secret plans to deprive UBS of confidential information. *Id.* at 47-48.

Plaintiff and Fryman filed a Response to UBS's Amended Statement of Claim on January 29, 2014. In the Response, Plaintiff objected to FINRA's jurisdiction over him. Plaintiff also resisted UBS's requests for discovery on the basis that FINRA did not have jurisdiction over him. On October 22, 2014, UBS filed a motion to compel Plaintiff's responses to its discovery requests. On December 18, 2014, the FINRA arbitration Chairperson, acting on behalf of the FINRA arbitration panel, granted UBS's motion to compel and rejected Plaintiff's jurisdictional objections. On the question of whether FINRA had jurisdiction over Plaintiff, the Chairperson's full ruling is as follows:

> Claimant's Motion to Compel seeking FINRA jurisdiction over Alexander Freund on the basis that he is an "associated person" as defined in the Code of Arbitration Procedure is granted. The basis of this ruling is the broad language of Rule 13100(r)(2) and the Letter Agreement dated November 7, 2011 between UBS and Freund.

[1-8] at 3. On September 8, 2015, the FINRA case administrator sent the parties, including Plaintiff, notice that the arbitration of UBS's claims would begin on October 26, 2015.

On September 9, 2015, Plaintiff filed a complaint [1] in this Court seeking a declaration that he is not required to participate in the FINRA arbitration and preliminary and permanent injunctive relief. On September 17, 2015, Plaintiff filed a motion for preliminary injunction asking the court to enjoin UBS and "any individual or entity in active concert or participation with [UBS] from prosecuting any claims against, proceeding as to, or otherwise maintaining or

continuing the FINRA Arbitration as to Plaintiff." [5] at 3. At Plaintiff's request, the Court set an expedited briefing schedule on Plaintiff's motion for preliminary injunction and advised the parties that it would make every effort to issue a written ruling by October 23, 2015 given that the arbitration is set to begin the following week. The parties have fully briefed the motion. See [6], [11], [12].

## II.    Legal Standard

"A preliminary injunction is an extraordinary equitable remedy that is available only when the movant shows clear need." *Turnell v. CentiMark Corp.*, 796 F.3d 656, 661 (7th Cir. 2015) (citing *Goodman v. Ill. Dep't of Fin. and Prof'l Regulation,* 430 F.3d 432, 437 (7th Cir. 2005)). The Seventh Circuit uses a two-step analysis to assess whether preliminary injunctive relief is warranted. See *Girl Scouts of Manitou Council, Inc. v. Girl Scouts of USA, Inc.,* 549 F.3d 1079, 1085–86 (7th Cir. 2008). "In the first phase, the party seeking a preliminary injunction must make a threshold showing that: (1) absent preliminary injunctive relief, he will suffer irreparable harm in the interim prior to a final resolution; (2) there is no adequate remedy at law; and (3) he has a reasonable likelihood of success on the merits." *Turnell*, 796 F.3d at 661-62.

If the movement makes the required threshold showing, then the court moves on to the second stage and considers: "(4) the irreparable harm the moving party will endure if the preliminary injunction is wrongfully denied versus the irreparable harm to the nonmoving party if it is wrongfully granted; and (5) the effects, if any, that the grant or denial of the preliminary injunction would have on nonparties," *i.e.* the public interest. *Id.* at 662. The Court balances the potential harms on a sliding scale against the movant's likelihood of success. The greater the

movant's likelihood of success, "the less strong a showing" the movant "must make that the balance of harm is in its favor." *Foodcomm Int'l v. Barry*, 328 F.3d 300, 303 (7th Cir. 2003).

## III.    Analysis

### A.    Movant's Threshold Showing

The Court will begin by assessing Plaintiff's likelihood of success on the merits and then will consider whether Plaintiff would suffer irreparable harm or have an adequate remedy at law if his request for an injunction were denied.

#### 1.    Reasonable Likelihood of Success On The Merits

Pursuant to the Federal Arbitration Act, 9 U.S.C. § 1 *et seq.* ("Act"), "a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction * * * shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. "The effect of the section is to create a body of federal substantive law of arbitrability, applicable to any arbitration agreement within the coverage of the Act." *Moses H. Cone Mem'l Hosp. v. Mercury Const. Corp.*, 460 U.S. 1, 24 (1983). See also *Int'l Ins. Agency Servs., LLC v. Revios Reinsurance U.S., Inc.*, 2007 WL 951943, at *2 (N.D. Ill. Mar. 27, 2007) ("Arbitrability is governed by federal law."). Section 2 of the Act is "a congressional declaration of a liberal federal policy favoring arbitration agreements, notwithstanding any state substantive or procedural policies to the contrary." *Moses H. Cone*, 460 U.S. at 24. Thus, "[w]hen the parties have agreed to arbitrate some matters pursuant to an arbitration clause, 'the law's permissive policies in respect to arbitration counsel that any doubts concerning the scope of arbitral issues should be resolved in favor of arbitration.'" *Local 73, Serv. Employees Int'l Union, AFL-CIO v. UChicago Argonne, LLC*, 2011 WL 635862, at *3 (N.D. Ill. Feb. 11, 2011) (quoting *Granite*

*Rock Co. v. Int'l Bhd. of Teamsters,* 561 U.S. 287, 298 (2010)). "[A]n order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." *Int'l Bhd. of Elec. Workers, Local 21 v. Illinois Bell Tel. Co*., 491 F.3d 685, 687-88 (7th Cir. 2007) (internal quotation marks and citation omitted).

Under the Act, arbitration may be compelled if the following three elements are shown: (1) a written agreement to arbitrate, (2) a dispute within the scope of the arbitration agreement, and (3) a refusal to arbitrate. See 9 U.S.C. § 4; *Zurich Am. Ins. Co. v. Watts Indus., Inc.*, 417 F.3d 682, 687 (7th Cir. 2005). In this case, the parties' dispute focuses on the first two elements—that is, whether there is a binding written agreement that requires Plaintiff to arbitrate UBS's claims against him. Because arbitration is "contractual by nature," a "party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *Zurich Am. Ins. Co.*, 417 F.3d at 687 (internal quotation marks and citations omitted). That said, the Seventh Circuit has recognized "five doctrines through which a non-signatory can be bound by arbitration agreements entered into by others: (1) assumption; (2) agency; (3) estoppel; (4) veil piercing; and (5) incorporation by reference." *Id*. See also *Arthur Andersen LLP v. Carlisle*, 556 U.S. 624, 631 (2009) (recognizing that "'traditional principles' of state law" may allow a contractual arbitration agreement "to be enforced by or against nonparties to the contract through 'assumption, piercing the corporate veil, alter ego, incorporation by reference, third-party beneficiary theories, waiver and estoppel'" (quoting 21 R. Lord, WILLISTON ON CONTRACTS § 57:19, p. 183 (4th ed. 2001))).

In this case, UBS argues that Plaintiff submitted to the jurisdiction of FINRA in three different ways: first, by signing the Form U-4 two months after leaving UBS; second, by signing

the letter agreement when he began working at UBS; and third, due to his status as an agent of UBS, which is itself a member of FINRA. The Court considers each argument in turn.

### a. Plaintiff's execution of a U-4 approximately two months after resigning from UBS

UBS argues that Plaintiff agreed to have FINRA decide UBS's claims against him because, approximately two months after leaving UBS, Plaintiff signed a Form U-4 submitting to FINRA's jurisdiction. Plaintiff argues, on the other hand, that the Form U-4 does not apply retroactively to UBS's claims against him, which Plaintiff argues arose before Plaintiff signed the U-4.

The issue of whether the U-4 requires the parties to arbitrate UBS's claims is for the Court—not the arbitrator—to decide. "Whether a particular dispute must be arbitrated is generally a question for judicial determination, unless the parties 'clearly and unmistakably' provided otherwise in their agreement." *Duthie v. Matria Healthcare, Inc.*, 540 F.3d 533, 536 (7th Cir. 2008) (quoting *Howsam v. Dean Witter Reynolds Inc.*, 537 U.S. 79, 82 (2002)). See also *Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S. 287, 297 (2010) (explaining that "[w]here there is no provision validly committing them to the arbitrator," the court must resolve any issues that call "into question the formation or applicability of the specific arbitration clause that a party seeks to have the court enforce"). In this case, the U-4 does not contain any language indicating that FINRA has authority to decide the issue of arbitrability. Although FINRA has authority under its rules to "interpret and determine the applicability of all provisions under [the FINRA] Code," this language does not evidence a clear and unmistakeable intent that the arbitrator will decide whether a particular dispute is subject to arbitration. Therefore, the Court will proceed to determining whether the U-4 constitutes an agreement by Plaintiff to arbitrate UBS's claims.

The Court examines the U-4 using principles of contract law to determine if Plaintiff agreed to arbitrate UBS's claims against him. In section 4 of the U-4, Plaintiff was required to check boxes indicating the SROs in which he was registering. One of the boxes Plaintiff checked was "FINRA." [11-1] at 3. Section 15A of the U-4 contains certain acknowledgements and consents by the applicant. Plaintiff agreed to "submit to the authority" of FINRA "in consideration of" FINRA "receiving and considering [his] application." *Id.* at 8. Plaintiff further agreed to "arbitrate any dispute, claim or controversy that may arise between me and my firm, or a customer, or any other person, that is required to be arbitrated under the rules, constitutions, or by-laws of the SROs indicated in Section 4 (SRO REGISTRATION) as may be amended from time to time and that any arbitration award rendered against me may be entered as a judgment in any court of competent jurisdiction." *Id.* at 9.

FINRA Rule 13200 requires arbitration of a dispute "if the dispute arises out of the business activities of a member or an associated person and is between or among: Members; Members and Associated Persons; or Associated Persons." The term "member" is defined in FINRA Rule 13100 as "any broker or dealer admitted to membership in FINRA, whether or not the membership has been terminated or cancelled; and any broker or dealer admitted to membership in a self-regulatory organization that, with FINRA consent, has required its members to arbitrate pursuant to the Code and/or to be treated as members of FINRA for purposes of the Code, whether or not the membership has been terminated or cancelled." The term "Associated Person" has the same meaning as "Person Associated with a Member," which is defined in FINRA Rule 131000(r) as "(1) A natural person who is registered or has applied for registration under the Rules of FINRA; or (2) A sole proprietor, partner, officer, director, or branch manager of a member, or other natural person occupying a similar status or performing

similar functions, or a natural person engaged in the investment banking or securities business who is directly or indirectly controlling or controlled by a member, whether or not any such person is registered or exempt from registration with FINRA under the By-Laws or the Rules of FINRA."

The parties apparently agree that their dispute would be subject to arbitration *if* Plaintiff had signed the U-4 before their dispute arose, because UBS is a FINRA "member" and Plaintiff would be an "associated person." However, Plaintiff signed the U-4 approximately two months after leaving UBS, while he was an employee at Wells Fargo. Plaintiff argues that by signing the U-4 on April 19, 2012, he did not agree retroactively to arbitrate claims that arose prior to that date. UBS responds that "the timing of an alleged tort or breach is not significant in determining whether a dispute should be submitted to arbitration in FINRA under the Form U-4." [11] at 6. Instead, UBS asserts, the "proper inquiry is whether UBS's claims for relief against [Plaintiff] arose out of his employment or termination of his employment with UBS, which they do." *Id.* UBS also argues, as a factual matter, that Plaintiff's "misconduct continued after he went to Wells Fargo over many months as Freund worked with Kinnear in illegally soliciting UBS clients, aided by the use of information and records misappropriated from UBS." *Id.* at 9.

Before considering whether the U-4's arbitration provision should be applied retroactively to claims that predated Freund's signing of the document, the Court will first address whether UBS's amended statement of claim alleges that Plaintiff engaged in any misconduct after Plaintiff signed the U-4. UBS alleges that its dispute "arises from the actions committed by Kinnear, and his team"—which included Plaintiff—"both during the course of their UBS employment and after their employment ended, as associated persons at Wells Fargo." [1-1] at 7. More specifically, UBS alleges that Plaintiff created detailed excel spreadsheets of

confidential customer information while at UBS, and that Plaintiff "admitted at his deposition in the State Court Litigation that he had kept those spreadsheets on his personal computer when he resigned from UBS and joined Wells Fargo." [1-1] at 25-26. UBS does not allege that Plaintiff personally disclosed or misused the spreadsheets after leaving UBS. However, UBS does allege that "over the ensuing weeks and months" following the team's resignation on February 13, 2012, "Kinnear used the stolen records and information that he had misappropriated from UBS to successfully pirate away from UBS the patronage of the UBS clients he had previously serviced while a UBS employee" and "also used the information to solicit the business of other UBS clients whom he had never serviced or met." [1-1] at 42. In Count III, UBS alleges that Plaintiff had a contractual duty during and "upon the termination of their employment with UBS" not to "utilize any of UBS's Confidential Information for any purpose," that Plaintiff breached his agreement with UBS "by engaging in the activities alleged herein," and that as a direct, proximate result, "UBS has been damaged in an amount that exceed hundreds of thousands of dollars." [1-1] at 46-47. In Count IV, UBS alleges that Plaintiff breached his fiduciary duties while employed by UBS, but does not allege that Plaintiff had or breached any fiduciary duties to UBS after he resigned.

Taken as a whole, the amended statement of claim does not directly allege that Plaintiff "worked with Kinnear in illegally soliciting UBS clients" over "many months" after leaving UBS. However, the statement of claim does allege generally that it "arises from the actions committed by Kinnear, and his team both during the course of their UBS employment and after their employment ended, as associated persons at Wells Fargo." [1-1] at 7. And it alleges that Plaintiff secretly compiled and stole confidential client information while at UBS, that Plaintiff sent this information to Kinnear while at UBS, that Plaintiff kept this information after he left

UBS and went to work for Wells Fargo, and that as a proximate result of these actions Kinnear used the confidential client information (allegedly purloined by Plaintiff and transmitted by him to Kinnear) in the months following his and Plaintiff's resignation to solicit UBS clients to Wells Fargo, which damaged UBS in the amount of hundreds of thousands of dollars.

The next question is whether these allegations are sufficient to render part or all of UBS's claims against Plaintiff subject to arbitration under Plaintiff's agreement, in the U-4, to "arbitrate any dispute, claim or controversy that may arise between me and my firm, or a customer, or any other person, that is required to be arbitrated under the rules, constitutions, or by-laws of the SROs." UBS cites *In re Oil Spill by Amoco Cadiz Off Coast of France Mar. 16, 1978*, 659 F.2d 789 (7th Cir. 1981), in support of its position that "[t]he relevant inquiry is not when the tort was committed, but rather whether the arbitration clause covers the particular claims asserted." [11] at 8. In *Amoco Cadiz*, the owner of a tanker brought suit against the owner of a salvage tug that unsuccessfully sought to rescue the tanker after it became stranded. The parties had a salvage agreement which provided that "any difference arising out of this Agreement or the operations thereunder shall be referred to arbitration." *Id.* at 791. After the salvage tug tried and failed to rescue the tanker, the tanker owner sued for negligence, breach of warranty of seaworthiness, and false and fraudulent misrepresentations in connection with the attempted salvage. The district court determined that these tort claims arose prior to the date the parties signed the salvage agreement and, therefore, were not subject to arbitration. The Seventh Circuit reversed. It found that that the arbitration clause was broad enough to cover the negligence, misrepresentation, and breach of warranty claims, regardless of when the torts may have been committed or when the salvage tug's duty to the tanker arose, "given the close relationship of those torts to the subject matter of the" salvage agreement. *Id.* at 795. The court also pointed out

that "the damages incurred by [the tanker owner] could not be determined without an examination of the entire operation and its aftermath," and therefore found "unconvincing the district court's attempt to consider the asserted tort claims as separate from the salvage operation which is the subject matter of" the salvage agreement. *Id.* at 795 n.9. The court also emphasized that its "finding in favor of arbitration is bolstered by the strong public policy favoring arbitration of maritime and commercial disputes which is embodied in the Arbitration Act." *Id.* at 795.

Although *Amoco Cadiz* arose under different factual circumstances, it demonstrates the absence of a hard and fast rule in the Seventh Circuit prohibiting an arbitration agreement from covering disputes that arose before the agreement was signed. In this case, the damages claimed by UBS resulted from the alleged actions of Kinnear and his team—including Plaintiff—in stealing confidential client information from UBS and then using the information over several months to solicit clients away from UBS and to the team's new employer, Wells Fargo. In all likelihood, UBS's claim cannot be resolved, and its damages (if any) ascertained, without examining the team's "entire operation and its aftermath" (*id.* at 795 n.9), which did not end until several months after the team left UBS and joined Wells Fargo. Plaintiff signed the U-4 only two months after leaving UBS.

Plaintiff cites two out-of-circuit cases for the proposition that "courts have repeatedly refused to apply arbitration agreements retroactively to disputes that arose before the parties signed the agreement, unless the language of the arbitration clause expressly provided otherwise." [12] at 5 (citing *Peerless Importers, Inc. v. Wine, Liquor & Distillery Workers Union Local One*, 903 F.2d 924, 928 (2d Cir. 1990); *Newbanks v. Cellular Sales of Knoxville, Inc.*, 548 F. App'x 851, 852-57 (4th Cir. 2013)). But neither case is binding in this Circuit and

neither requires express language concerning retroactivity. Instead, in each case, the relevant arbitration clause did not apply retroactively because it was limited by its terms to disputes arising out of the contract containing the arbitration clause or out of the new employment relationship that was created by the contract. *Peerless Importers*, 903 F.2d at 928 (holding that a new collective bargaining agreement providing for arbitration, which was restricted to disputes arising under the agreement and during its term, did not apply to a claim for reinstatement by an employee discharged prior to the new agreement); *Newbanks*, 548 F. App'x at 852-53 (holding that an arbitration provision in employees' compensation agreements, which required the arbitration of disputes "arising out of, or in relation to" the compensation agreement or the employee's employment, did not require the arbitration of employees' claims that arose before they executed the compensation agreements, at which time they were independent contractors rather than at-will employees).

In this case, by contrast, the U-4 covers "any dispute, claim or controversy that may arise" between Plaintiff and his "customer, or any other person, that is required to be arbitrated under" FINRA's rules. It is not limited to disputes arising out of a particular agreement or out of Plaintiff's employment with Wells Fargo. Cf. *Kristian v. Comcast Corp.,* 446 F.3d 25, 32-33 (1st Cir. 2006) (holding that an agreement to arbitrate "any claim or dispute relating to or arising out of this agreement or the services provided" could be applied retroactively because "the phrase 'or the services provided' covers claims or disputes that do not arise 'out of this agreement' and hence are not limited by the time frame of the agreements"); *Zink v. Merrill Lynch Pierce Fenner & Smith,* 13 F.3d 330, 332 (10th Cir. 1993) (finding that a contractual agreement to arbitrate "[a]ny controversy between [the parties] arising out of [plaintiff's] business or this agreement shall be submitted to arbitration" was "clearly broad enough to cover

the dispute at issue despite the fact that the dealings giving rise to the dispute occurred prior to the execution of the agreement"; also noting that "Plaintiff's contention that an agreement to arbitrate a dispute must pre-date the actions giving rise to the dispute * * * runs contrary to contract principles which govern arbitration agreements"); *Peerless Importers*, 903 F.2d at 927 ("[W]here [an] arbitration clause is broad, we have directed courts to compel arbitration whenever a party has asserted a claim, however frivolous, that on its face is governed by the contract.").

The Court finds most instructive a case that neither party cites, *Marcus v. Masucci*, 118 F. Supp. 2d 453 (S.D.N.Y. 2000), which involved a U-4 and the arbitration rules of FINRA's predecessor, the National Association of Securities Dealers ("NASD"). In 1998, Marcus and his business partner Masucci formed a joint venture to develop an investment product called Shared Application Mortgage Securities ("SAMS"). *Id.* at 454. In April 1999, Bear Stearns (a NASD member) hired Masucci. In April 2000, Chase Securities (also a NASD member) hired Marcus and Marcus signed a U-4. *Id.* at 454-55. In his U-4, Marcus agreed "to arbitrate any dispute, claim or controversy that may arise between [the employee and his] firm, or a customer, or any other person, that is required to be arbitrated under the rules, constitutions, or by-laws of [NASD]." *Id.* at 457.

Marcus later filed suit in federal court alleging that Mascussi, in collaboration with Bear Stearns, used misappropriated trade secrets to develop SAMS products in violation of his fiduciary and contractual duties to Marcus. *Id.* at 454-55. Mascussi sought to compel Marcus to arbitrate based on his U-4 and an NASD rule that required the arbitration of "any dispute, claim, or controversy arising out of or in connection with the business of any member of the Association, or arising out of the employment or termination of employment of associated

person(s)[2] with any member[3] * * *: (a) between or among members; (b) between or among members and associated persons; (c) between or among members or associated persons and public customers, or others; and (d) between or among members, registered clearing agencies with which the Association has entered in an agreement." *Id.* at 455-56. Marcus resisted arbitration on the basis that "the agreement to arbitrate cannot be applied retroactively to claims which arose before he became bound as an employee of Chase Securities to arbitrate disputes in accordance with the NASD By-Laws." *Id.* at 457. According to Marcus, his claims arose between November 1998 and March 1999, but he did not sign the U-4 until April 2000.

The court held that Marcus was required to arbitrate. First, the court determined as a factual matter that "[t]he complaint [was] not limited to the period prior to March 1999" but instead alleged ongoing misconduct by Mascussi and Bear Stearns. *Id.* Second, the court explained that, "even if retroactive application of the agreement to arbitrate were involved, the Second Circuit has expressly rejected the argument that securities industry arbitration agreements cannot be applied retroactively." *Id.* (citing *Coenen v. R. W. Pressprich & Co.*, 453 F.2d 1209, 1211-12 (2d Cir. 1972)). The court noted that the "Form U–4 contains a broad arbitration clause covering disputes not only with a registered employee's current employer but also with any NASD-member firm or any other 'associated person.'" *Id.* at 458. According to the court, "[t]he only further limitation on the scope of the matters required to be arbitrated is that they 'aris[e] in connection with the business of [the NASD] member, or in connection with

---

[2] The NASD code defined "associated person" as "(1) a natural person registered under the Rules of the Association; or (2) a sole proprietor, partner, officer, director, or branch manager of any member, or any natural person occupying a similar status or performing similar functions, or any natural person engaged in the investment banking or securities business who is directly or indirectly controlling or controlled by such member whether or not any such person is registered or exempt from registration with the NASD under these By–Laws or the Rules of the Association." *Id.* at 456.

[3] "Member" was defined as "any broker or dealer admitted to membership in the NASD." *Id.* at 456.

the activities of [the] associated person, or * * * out of the employment or termination of employment of [the] associated person(s) with [the] member.'" *Id.* Applying the presumption of arbitrability, the court then concluded that "any claims of Marcus existing prior to April 2000 are subsumed in his ongoing claims arising out of the same alleged misappropriation" and that the entire dispute was subject to arbitration. *Id.*

In this case, UBS's amended statement of claim suggests that Plaintiff's misconduct continued after Plaintiff left UBS and went to work for Wells Fargo. While these allegations are not as clear as the ones at issue in *Marcus*, this is not dispositive. Like the U-4 in *Marcus,* Plaintiff's U-4 requires him to arbitrate his dispute with "any other person" if that dispute is "required to be arbitrated" under FINRA's rules. FINRA requires the arbitration of a dispute if it "arises out of the business activities of a member or an associated person and is between or among: Members; Members and Associated Persons; or Associated Persons." UBS is a "Member" of FINRA. Plaintiff, like Marcus, became an "associated person," at the latest, when he "applied for registration under the Rules of FINRA." UBS's claims "arise out of the business activities" of UBS and Plaintiff: namely, UBS's sale of securities to its customers and Plaintiff's alleged theft and transmission to the Kinnear team of confidential information concerning those customers. No language in the U-4 or FINRA's arbitration rules expressly prohibits the arbitration of disputes that arose before the party resisting arbitration signed a U-4. Considering all of these circumstances, because the Court cannot say "with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute," Seventh Circuit precedent teaches that the proper course is to apply the presumption in favor of arbitration. *Bhd. of Elec. Workers*, 491 F.3d at 687-88.[4] Accordingly, the Court concludes that

---

[4] This case is also similar to *Coenen v. R. W. Pressprich & Co.*, 453 F.2d 1209 (2d Cir. 1972), in which the Second Circuit considered whether the arbitration clause contained in the New York Stock Exchange

Plaintiff has not established a reasonable likelihood of success on the merits of his argument that he is entitled to an injunction against any FINRA arbitration proceedings involving him.

Given that UBS needs only one basis for FINRA jurisdiction over Plaintiff, the analysis in the preceding section means that the analysis on the likelihood of success element favors UBS. Nevertheless, in the interest of completeness, the Court will assess the alternative arguments advanced by UBS, neither of which the Court finds persuasive.

        **b.**      **Plaintiff's letter agreement with UBS and alleged status as an "associated person" under FINRA's rules**

UBS argues that the November 7, 2011 letter agreement that Plaintiff signed when he began working for UBS provides a second basis for FINRA jurisdiction over Plaintiff. UBS relies on a provision of the letter agreement in which Plaintiff agreed to "adhere to all federal laws and rules and regulations of the various exchanges or other regulatory and/or self-regulatory organizations of which [UBS] is a member as well as all internal rules, regulations[,] policies and codes of conduct that the Firm has established." [1-1] at 3. UBS argues that by agreeing to this provision, he "explicitly agreed * * * to 'abide and adhere to all' rules of the self-regulatory organizations of which UBS is a member, namely, FINRA." [11] at 10. FINRA Rule 13200

---

Constitution was limited in application to future disputes that arise after both parties to the dispute have become members of the exchange, or whether it also included disputes that arose prior to the time the plaintiff (who was resisting arbitration) became a member. When the plaintiff became a member, he agreed that "*[a]ny controversy* between parties who are members, allied members, member firms or member corporations shall, at the instance of any such party * * *, be submitted for arbitration, in accordance with the provisions of the Constitution and the rules of the Board of Governors." *Id.* at 1211 (emphasis added). The court found that the parties were required to arbitrate, regardless of when the plaintiff because a member of the exchange. The court explained that "[h]ad those who drafted the clause intended otherwise they doubtless would have used language plainly stating that 'any future controversy' or any controversy between members 'arising after both parties to the dispute have become' members." *Id.* In this case, the arbitration agreement is not as broad as in *Coenen*: Plaintiff agreed to arbitrate "all disputes that may arise," not "all disputes." On the other hand, the U-4's arbitration language is not as restrictive as the language that *Coenen* suggests would be necessary to find that the U-4 has only prospective effect; it is not limited to "all disputes that may arise in the future" or to "all disputes that arise on or after the effective date of this agreement."

requires members and associated persons to arbitrate "disputes arising out of the business activities of a member or associated person." According to UBS, Plaintiff is an "associated person" and UBS is a "member" and therefore any disputes between Plaintiff and UBS must be arbitrated pursuant to FINRA Rule 13200.

The threshold issue that the Court must address is whether the letter agreement's reference to the "rules and regulations of the various exchanges or other regulatory and/or self-regulatory organizations of which [UBS] is a member" is sufficient to make the FINRA rules binding on Plaintiff. [1-1] at 3. UBS assumes that it is, but does not cite any legal theory or case law in support of its argument. As noted above, a non-signatory to an arbitration agreement may be required to arbitrate when the non-signatory signed another agreement that incorporates by reference the arbitration agreement. *Zurich Am. Ins. Co.*, 417 F.3d at 687. The letter agreement "is governed by the laws of the State of New Jersey without reference to the principles of conflict of laws" ([1-1] at 3), and therefore the Court will look to New Jersey law to determine if the letter agreement incorporates by reference the FINRA arbitration rules such that Plaintiff agreed to be bound by those rules.

In New Jersey, "[i]n order for there to be a proper and enforceable incorporation by reference of a separate document, the document to be incorporated must be described in such terms that its identity may be ascertained beyond doubt and the party to be bound by the terms must have had knowledge of and assented to the incorporated terms." *Alpert, Goldberg, Butler, Norton & Weiss, P.C. v. Quinn*, 410 N.J. Super. 510, 533 (App. Div. 2009) (internal quotation marks and citation omitted). A agreement "cannot be found properly incorporated, if the provisions of such agreement are not known by the party to be bound at the time of

acknowledgment." *Guidotti v. Legal Helpers Debt Resolution, L.L.C.*, 74 F. Supp. 3d 699, 710 (D.N.J. 2014) (applying New Jersey law).

The Court concludes that the letter agreement does not incorporate by reference the FINRA arbitration rules because it is not specific enough to allow Plaintiff to "ascertain without doubt" that the FINRA arbitration rules would be binding on him. The Letter Agreement does not mention FINRA or arbitration. UBS has offered no evidence that Plaintiff knew the terms of FINRA's rules on arbitration when he signed the Letter Agreement and assented to them.[5] Therefore, the letter agreement does not provide a basis for FINRA exercising jurisdiction over Plaintiff and Plaintiff has a reasonable likelihood of success on this issue.

### c.    Agency

UBS's third argument in support of FINRA jurisdiction is based on an "agency" theory. According to UBS, Plaintiff "was an agent of UBS at the time of his misconduct" and owed a duty of loyalty to UBS, and therefore "was subject to the contracts and agreements entered into by UBS," including UBS's agreement as a member of FINRA to be bound by FINRA's arbitration rules. [11] at 12-13. According to UBS, "[c]ourts have consistently compelled employees of brokerage firms to arbitrate disputes irrespective of whether the employees personally signed an agreement to arbitrate by virtue of the principal's agreement binding on the agent." *Id.* at 13.

The cases that UBS cites do not support its position that Plaintiff, as an agent of UBS, is bound to arbitrate claims that UBS brings against Plaintiff by virtue of UBS's agreement with FINRA to arbitrate certain types of claims. Two of the cases UBS relies on involved the

---

[5] If the record showed that Plaintiff was a seasoned veteran of the securities industry at the time he joined UBS, perhaps the Court could draw a reasonable inference that Plaintiff knew (or should have known) about FINRA's arbitration rules. However, the record suggests exactly the opposite: that Plaintiff's job with UBS was his first endeavor in the field.

offensive use of an arbitration agreement by a nonsignatory against a signatory, which is not the case here. In *Howells v. Hoffman*, 209 Ill. App. 3d 1004 (1991), a stockbroker was allowed to compel his employer's customers to arbitrate their claims against him based on an arbitration agreement between the employer and investors, even though the stockbroker was not himself a signatory to the arbitration agreement. *Id.* at 1008-09. In *Pritzker v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 7 F.3d 1110 (3d Cir. 1993), a securities broker, its consultant, and its sister corporation sought to compel pension plan trustees to arbitrate their claims that the broker, financial consultant, and sister corporation violated ERISA. The broker and the trustees had a signed arbitration agreement, to which the consultant and the sister corporation were not parties. The court found that the trustees' claims against the broker, consultant, and sister corporation were all subject to arbitration, because the consultant and the sister corporation were acting as the broker's agents when engaging in the alleged ERISA violations. *Id.* at 1121-22. Neither *Hoffman* nor *Pritzker* stands for the proposition that a signatory to an arbitration agreement can require its own agent to arbitrate based on the signatory's arbitration agreement with a third party.

UBS also cites *Belom v. Nat'l Futures Ass'n*, 284 F.3d 795 (7th Cir. 2002). In that case, an employee whose employer was a registered member of the Commodity Futures Trading Commission ("CFTC") was compelled to arbitrate claims brought by customers against the employee, because the federal statutes and regulations governing CFTC—not an arbitration contract signed by the parties—required members *and all of their employees* to arbitrate disputes brought by customers. *Id.* at 799. *Belom* does not address whether an employer that is a member of an SRO (like FINRA) can use its arbitration agreement with the SRO offensively to force its employees to arbitrate, even though the employees have never signed an arbitration agreement.

In short, UBS has no legal support for its theory that FINRA can force Plaintiff to arbitrate simply because Plaintiff was UBS's agent and UBS has agreed with FINRA to arbitrate certain disputes. While courts have invoked "common law agency principles" as "a basis for applying arbitration provisions to non-signatories, they have done so only when 'a signatory has brought claims against nonsignatory agents and the agents then seek to invoke the arbitration clause against the *signatory*.'" *Redman v. Allen*, 2006 WL 3227890, at *2 (N.D. Ill. Nov. 3, 2006) (quoting *Legacy Wireless Servs., Inc. v. Human Capital, L.L.C.,* 314 F. Supp. 2d 1045, 1054 (D. Or. 2004)). The situation is "materially different" when a signatory seeks to invoke an arbitration clause against a nonsignatory, because under general agency principles "a person making or purporting to make a contract with another as agent for a disclosed principal does not become a party to the contract." *Id.* (quoting *Legacy Wireless Servs.,* 314 F. Supp. 2d at 1054). See also *Proshred Holdings Ltd. v. Conestoga Document & Prod. Destruction, Inc.,* 2002 WL 1067328, at *5 (N.D. Ill. May 28, 2002) ("The Court, after exhaustive research, has been unable to locate any controlling authority supporting the position that * * * a signatory may bind a non-signatory agent to an arbitration agreement entered into by its principal."). The agency theory UBS advances in this case is even more strained than the ones rejected in *Redman* and *Proshred*, because UBS seeks to compel arbitration by its *own* agent based on UBS's agreement to comply with FINRA's arbitration rules, even though UBS has no written arbitration agreement with its agent. In short, the "agency" theory does not provide a basis for FINRA exercising jurisdiction over Plaintiff, and Plaintiff has a reasonable likelihood of success on this issue.

### 2.     Irreparable Harm and No Adequate Remedy at Law

Plaintiff argues that he lacks an adequate remedy at law and will suffer irreparable harm if he is compelled to move forward with the arbitration of UBS's claims, because "arbitration

awards are almost never vacated." [6] at 11. Plaintiff quotes *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 942 (1995), for the proposition that "who—court or arbitrator—has the primary authority to decide whether a party has agreed to arbitrate can make a critical difference to a party resisting arbitration," because when a party has agreed to arbitrate, a reviewing court "will set that decision aside only in very unusual circumstances." [6] at 11. The Court in *First Options* made this statement while considering whether "a court must defer to an arbitrator's arbitrability decision when the parties submitted that matter to arbitration." *First Options*, 514 U.S. at 943. The Court explained that if parties to arbitration have agreed to submit the arbitrability question itself to arbitration, then the court's standard for reviewing the arbitrator's decision as to arbitrability would be the same as reviewing any other matter that the parties have agreed to arbitrate, giving "considerable leeway to the arbitrator and setting aside his or her decision only in certain narrow circumstances." *Id.* In this case, the parties have not agreed to submit the issue of arbitrability to the arbitrator, so if Plaintiff seeks to vacate (or opposes confirmation of) the arbitration award, the reviewing court would not be deferring to an arbitrator's decision concerning whether Plaintiff is required to arbitrate UBS's claims.

In addition, *First Options* notes that one ground for vacating an arbitration award is where the "arbitrator exceeded his powers." 514 U.S. at 942 (citing 9 U.S.C. § 10). See also *Am. Postal Workers Union, AFL-CIO, Milwaukee Local v. Runyon*, 185 F.3d 832, 835 (7th Cir. 1999) (explaining that a court may vacate an arbitration award where "an arbitrator's award exceeds his authority" and that "when a party to the arbitration contends that the arbitrator acted beyond his designated authority, our task is limited to determining whether the arbitrator abided by the contractual limits placed on him to decide the dispute"). Plaintiff cites cases in support of the proposition that proceeding with the arbitration next week would constitute *per se* irreparable

harm and that any remedy at law after the fact of an arbitration constitutes an "empty promise." *Chicago Sch. Reform Bd. of Trustees v. Diversified Pharm. Servs., Inc.*, 40 F. Supp. 2d 987, 996 (N.D. Ill. 1999); see also [6] at 11-12 (collecting cases from this district as well as the Third and Eighth Circuits). But the Seventh Circuit has rejected the "proposition that going forward with an arbitration 'unalterably deprives the party of its right to select the forum'" because "[o]nce the arbitration ends, a party that believes the proceeding flawed because the arbitrators exceeded their remit has a simple remedy: a proceeding under the Federal Arbitration Act to deny enforcement of the award." *Trustmark Ins. Co. v. John Hancock Life Ins. Co.*, 631 F.3d 869, 872 (2011) (citing 9 U.S.C. § 10(a)(4)). The court also found that "[t]he only potential injury from waiting until the arbitrators have made their award is delay and the out-of-pocket costs of paying the arbitrators and legal counsel," which are not irreparable injuries under long-standing Supreme Court precedent. *Id.* (citing *Petroleum Exploration, Inc. v. Pub. Serv. Comm'n*, 304 U.S. 209, 222 (1938); *Renegotiation Bd. v. Bannercraft Clothing Co.*, 415 U.S. 1, 24 (1974); *FTC v. Standard Oil Co.*, 449 U.S. 232, 244, (1980)).[6] Based on this precedent, the Court concludes that even if its assessment of the likelihood of success were incorrect, Plaintiff would not be irreparably harmed nor would he lack an adequate remedy at law if he were required to participate in the FINRA arbitration.

B.        **Balancing of Potential Harms**

A court is required to balance the harm the non-movant will suffer if preliminary relief is granted against the irreparable harm the movant will suffer if relief is denied if it is satisfied that

---

[6] In *Trustmark*, the district judge had granted a preliminary injunction, concluding that the plaintiff "cannot be forced to arbitrate issues that it did not agree to arbitrate" and that compelling the plaintiff's participation amounted to irreparable harm, citing the *Chicago School Reform* case on which Plaintiff here relies as well. *Trustmark*, 631 F.3d at 872 (citing *Chicago School Reform*, 40 F. Supp. 2d at 996). The Seventh Circuit found two problems with the district court's analysis: (1) the plaintiff "*did* agree to arbitrate" the question at hand and (2) as explained in the text, proceeding with the arbitration did not constitute irreparable injury in any event. *Id.* (emphasis in original).

the moving party has demonstrated "(1) its case has some likelihood of success on the merits; (2) that no adequate remedy at law exists; and (3) it will suffer irreparable harm if the injunction is not granted." *Ty, Inc. v. Jones Grp., Inc.*, 237 F.3d 891, 895 (7th Cir. 2001). As discussed above, the Court finds that Plaintiff does not have a likelihood of success on the merits, has an adequate post-arbitration remedy at law, and would not suffer irreparable harm if his request for a preliminary injunction is denied. Therefore, it is unnecessary for the Court to balance the potential harms.

## IV. Conclusion

For these reasons, the Court denies Plaintiff's motion for preliminary injunction, but grants the motion for expedited ruling [5].

Dated: October 23, 2015

United States District Court Judge